*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-FM-0990

PETRONELLA MCKENZIE, APPELLANT

V.

PAUL PERSAUD, APPELLEE.

Appeal from the Superior Court
of the District of Columbia, Domestic Violence
(2020-CPO-000518)

(Hon. Elizabeth Wingo, Trial Judge)

(Submitted October 05, 2023          Decided November 6, 2025)

*Andrew K. Magloughlin*, with whom *Robyn M. Swanson* was on the brief, for appellant.

*Paul Persaud* filed a brief pro se.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and EASTERLY, *Associate Judges*.

Opinion for the court by *Associate Judge* Easterly.

Concurring opinion by *Chief Judge* Blackburne-Rigsby at page 12.

EASTERLY, *Associate Judge*: Petronella McKenzie[1] appeals from the trial court's denial of her second motion to extend her Civil Protection Order (CPO) against her former husband, Paul Persaud. She argues that the trial court construed the good cause standard for a CPO extension in contravention of the Intrafamily Offenses Act; failed to consider "the entire mosaic of the case" as required by this court's precedent; and "fail[ed] to make factual findings that would have supported extending [her] CPO." We affirm.

## I. Good Cause

Ms. McKenzie argues the trial court misconstrued the good cause standard for a CPO extension. Specifically, she asserts that (1) the trial court determined "good cause require[s] a new CPO violation, unless the petitioner can prove the respondent is mentally ill or has been recently arrested," and (2) this determination contravenes D.C. Code § 16-1005(d-1), which authorizes a "judicial officer . . . [to] extend . . . an order for good cause shown" and expressly states that, unless the requested extension is longer than two years, "a finding that an order has been violated is not necessary for a finding of good cause to . . . extend an order." We assume without deciding that, had the trial court limited what constitutes "good

---

[1] Ms. McKenzie restored her maiden name from Petronella McKenzie-Persaud after her divorce.

cause" in the manner Ms. McKenzie claims, it would have committed legal error and so abused its discretion. *Ramirez v. Salvaterra*, 232 A.3d 169, 180 (D.C. 2020) (explaining that "this court reviews the grant or denial of a CPO extension for abuse of discretion"); *Carome v. Carome*, 262 A.3d 242, 248 (D.C. 2021) (explaining that a "trial court abuses its discretion when it rests its conclusions on incorrect legal standards"). But the court did not do this.[2]

As reflected in the transcript of its ruling, the trial court explained that, in order to get an extension of her CPO, Ms. McKenzie had to show "good cause," which, relying on this court's decision in *Ramirez*, the court defined as "a cognizable danger that the Respondent will commit, or threaten to commit, a criminal offense

---

[2] The concurrence asserts that the majority "miss[es] an opportunity" to address whether this court's understanding of the good cause standard as articulated in *Ramirez* was legislatively overruled or at least broadened by recent amendments to D.C. Code § 16-1005. *Post* at 12. But as we explain, the entirety of Ms. McKenzie's argument that the court misinterpreted the law is premised on her misrepresentation of how the court ruled, and we are of the view that we lack the power to issue an advisory opinion about the error the trial court would have committed had it ruled in a way other than what the record reflects. D.C. Code § 11-721(e) (authorizing this court "[o]n the hearing of any appeal in any case" to "give judgment *after an examination of the record*" (emphasis added)); *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) ("This court has no authority to issue advisory opinions regarding questions which may or may not arise."); *see also Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (explaining that a federal court may not issue "an opinion advising what the law would be upon a hypothetical state of facts" (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971))); *Stearns v. Wood*, 236 U.S. 75, 78 (1915) ("The province of courts is to decide real controversies, not to discuss abstract propositions.").

against the Petitioner in the coming year if not extended." *See Ramirez*, 232 A.3d at 183. The court further explained, again relying on *Ramirez*, that in assessing good cause it was obligated to consider "the evidence of what occurred before the original CPO was issued, the nature of the criminal offense that served as the basis for the CPO, and what has occurred since the original CPO was issued and any subsequent extensions [that] were granted." *See id.* at 185. And the court expressly acknowledged that, in conducting its good cause analysis under the Intrafamily Offenses Act, "[i]t is clear . . . that I do *not* have to find a violation in order to extend" a CPO.

Ms. McKenzie briefly acknowledges most of these statements by the trial court in her statement of facts in her brief, but she makes no mention of them in her summary of argument or argument. Instead, to support her assertion that the court misconstrued the good cause standard, Ms. McKenzie reads two sections of the record out of context.

First, Ms. McKenzie quotes the court's observation that Ms. McKenzie faced "somewhat of an uphill battle if in 2021 all [the prior presiding judge] specifically found were technical violations and" there were "no violations of any kind to go over at this point." Assuming that this statement reflected a misunderstanding of the statute, *but see supra*, the court expressed this view, in Ms. McKenzie's own words,

"at the outset" of the second day of the two-day hearing on her motion. Thereafter, Ms. McKenzie presented the remainder of her case and argued repeatedly in her closing that she did not have to show that Mr. Persaud had violated the CPO to show good cause for an extension.[3] As noted above, in its ruling, the court expressly acknowledged that this was the law.

Second, Ms. McKenzie asserts that the court "constrained Ms. McKenzie's avenues to prove good cause to showing that Mr. Persaud had a mental illness or had been recently arrested for harming another person because he did not violate her most recent CPO." But the court did not say this. Rather, after explaining both that it had to find good cause that Mr. Persaud might commit or threaten to commit another offense against Ms. McKenzie and that, in so doing, it did not have to find that Mr. Persaud had violated the extended CPO, the court explained that there were a number of ways a petitioner might "show that the danger still exists" even absent any contact between the parties,

> *for example, if* someone had ongoing mental health issues
> that caused them to behave erratically . . . or ended up
> getting repeated arrests . . . there are a number of things

---

[3] At the beginning of her closing, Ms. McKenzie argued that "[a]s the Court is aware, D.C. Section 1005 states that a judicial officer may extend an order for good cause shown, and a finding that an order has been violated is not necessary for a finding of good cause." Later she reminded the court, "Section 1005, as I said earlier, states that there is no violation needed to find good cause to extend the order."

that [a petitioner] *could* show that would indicate a current mental state that even if there were no violations, that there would be a cognizable danger.

The court then continued to examine the evidence presented by Ms. McKenzie[4] and concluded that she had not shown good cause that Mr. Persaud might commit or threaten to commit an offense against her. The court acknowledged that Ms. McKenzie had presented evidence, in the form of an email, that the Supervised Visitation Center had changed Mr. Persaud's visit with his daughter from in person to video. But the court accurately observed that, beyond that this change had been prompted by a communication by Ms. McKenzie's lawyer to the visitation supervisor, Ms. McKenzie had presented no evidence why the change had been made—and she had provided no evidence that Mr. Persaud had said inappropriate things or disregarded the visitation supervisor's instructions.

In short, the record does not reflect that, in ruling on Ms. McKenzie's motion for a second extension of her CPO, the trial court misconstrued the good cause standard in the ways Ms. McKenzie asserts. Thus her argument that the court abused its discretion fails.

---

[4] The court had already noted that there was an ongoing custody case that was "contentious" but that it did not "have any specific testimony as to why." *See infra* Part III.

## II. Entire Mosaic

Ms. McKenzie also argues the trial court abused its discretion in denying her CPO extension motion by failing to consider the "full mosaic of [her] relationship with Mr. Persaud." She alternately asserts that the court "focus[ed] solely on Mr. Persaud's single year of compliance with Ms. McKenzie's most recent CPO," and that it "focused almost entirely on the fact that Mr. Persaud did not violate the most recent CPO, and that his most recent violation [prior to the first extension] was a so-called 'technical violation.'" Either way, again grounding our review in the record before us and reviewing for abuse of discretion, *Ramirez*, 232 A.3d at 180, we discern no grounds to reverse.[5]

As a preliminary matter, we note that the trial court reviewed the transcripts the parties submitted from (1) the May 2020 hearing on Ms. McKenzie's motion to modify the February 2020 CPO (which had been issued on consent) and (2) the September 2021 hearing on Ms. McKenzie's first motion to extend the CPO. And

---

[5] Ms. McKenzie alternatively suggests that, however the trial court reviewed the evidence presented in support of her second motion to extend the CPO, this court should look back to the record she presented in support of her 2020 motion to modify the CPO, specifically evidence of Mr. Persaud's threats, and should grant her a second extension on that basis. She argues that such relief is warranted because she should not be "punished" for leaving her abuser and seeking a CPO before the Intrafamily Offenses Act was amended to allow trial courts to issue CPOs longer than one year. As we have no authority under the statute to issue extensions of preexisting CPOs, we decline to exercise de novo review in this manner.

the court took the step of stating on the record, "just so everybody is clear, . . . the transcripts were extremely helpful to me in understanding what the [prior presiding] [j]udge ruled and why she ruled." Further, the court allowed Ms. McKenzie to testify, over Mr. Persaud's objection, about matters referenced in the prior proceedings explaining that it was required to consider, among other things, "evidence of what occurred before the CPO was granted." Thus, the trial court heard testimony from Ms. McKenzie about her relationship with Mr. Persaud while they lived in Guyana from 2005 to 2016 and his sexual, physical, and emotional abuse during that time. The trial court also took judicial notice of records Ms. McKenzie had provided from the ongoing custody case, specifically the temporary custody order; and, as discussed above, *see supra* Part I, the court read into the record an email documenting that Mr. Persaud's in-person visits with the couple's daughter had been terminated after three visits "failed" for unspecified reasons. Lastly, the court heard testimony from Ms. McKenzie that she was still scared of Mr. Persaud and feared he was "still out to get [her]," as well as corroborating testimony from the facilitator of her support group who said that Ms. McKenzie had spoken about her ongoing fear of Mr. Persaud.

The court's consideration of all this evidence demonstrates that it well understood it was required to consider the "full mosaic" of the evidence of Ms. McKenzie's relationship with Mr. Persaud. *Ramirez*, 232 A.3d at 185 (defining

the "entire mosaic" to "encompass[] the full history of the parties' relationship and interactions—both before and after the original CPO was issued"). And that understanding was reflected in the court's ruling, both in its explication of the law and in its findings of fact.

Again, as noted above, *see supra* Part I, the court expressly stated that, in assessing whether Ms. McKenzie had shown good cause for an extension, it was obligated to consider "the evidence of what occurred before the original CPO was issued, the nature of the criminal offense that served as the basis for the CPO, and what has occurred since the original CPO was issued and any subsequent extensions [that] were granted." The court then adhered to this approach in reviewing the evidence. The court credited Ms. McKenzie's testimony that Mr. Persaud had abused, injured, and threatened her in the past and that she was still "genuinely frightened" as a result.[6] The court acknowledged that the CPO on consent had been

---

[6] The court did not mention Ms. McKenzie's claim that Mr. Persaud had masturbated in front of their son three times. But Ms. McKenzie's counsel did not seek to elicit any details about these incidents—indeed, she told Ms. McKenzie on direct "we don't want to talk about [them]" and that they were going to "move on"; Ms. McKenzie was later impeached with the fact that she had not mentioned these incidents in her initial CPO petition or her motion to modify in 2020 even though she alleged they had taken place in 2016 and 2017; and Ms. McKenzie's counsel did not mention this testimony in closing. So even if the court credited Ms. McKenzie on this point, we cannot say it was an abuse of discretion for the court not to rely on vague testimony that even Ms. McKenzie's own lawyer seemed uninterested in highlighting.

modified in 2020 because of Mr. Persaud's credited threats to Ms. McKenzie and had been extended in 2021 after he violated the CPO by communicating with Ms. McKenzie outside approved channels.[7] As noted above, *see supra* Part I, the court also considered the record (limited as it was) of the custody matter.[8] But ultimately the court concluded that this "mosaic," which included Mr. Persaud's lack of further violations, did not constitute good cause in 2022 to extend the CPO a

---

[7] The court explained these violations were "clearly" "technical," quoting the prior presiding judge's findings that (1) Mr. Persaud had not "follow[ed] to the letter exactly . . . how he was supposed to be communicating with the children" but that Ms. McKenzie likewise had not used approved channels of communication, and (2) these violations were "not as egregious as the original ones that led me to issue the protection order [referring to the 2020 order granting Ms. McKenzie's motion to modify the CPO]."

[8] The trial court indicated that it had no "specific testimony" as to why the custody matter was contentious. This is correct, and the court was not, as Ms. McKenzie asserts, "willful[ly] blind[] to relevant evidence." The explication that Ms. McKenzie provided at the hearing for why the custody matter was contentious was struck on hearsay grounds; Ms. McKenzie never provided another; and, as discussed, she never developed the other evidentiary "dots" she now argues that the court should have "connect[ed]" (e.g., the change in visitation and the masturbation accusations). Ms. McKenzie's bare testimony that the custody matter was "contentious," as many custody cases are, did not support good cause because it provided the court with no basis to conclude that Mr. Persaud currently presented a cognizable danger of injury. And Ms. McKenzie's argument that Mr. Persaud's threats in 2020 in connection with her removing the children from their home should have supported an inference in 2022 that he would lash out when the custody case ended does not foreclose a reasonable inference, on the totality of the record, that Mr. Persaud no longer posed a cognizable danger to Ms. McKenzie. *See Johnson v. United States*, 398 A.2d 354, 361-62 (D.C. 1979) (explaining that, on abuse-of-discretion review, we trust the trial court to "choose from a range of permissible conclusions" and we "do[] not render [our] own decision of what judgment is most wise under the circumstances presented").

second time because there was no evidence that he posed an ongoing "cognizable danger."

### III. Sufficiency of the Factual Findings

Lastly, Ms. McKenzie argues that the trial court failed to make sufficient factual findings regarding the custody case, which she believes proved good cause to extend her CPO. It is unclear if Ms. McKenzie is arguing that the court had some obligation to specifically recite all the evidence it heard about the custody matter in its ruling or that the court failed to consider evidence of the custody matter that compelled the issuance of a CPO. If the former, she cites no authority for this proposition and we are aware of none. *See* Super. Ct. Dom. Violence R. 12(c) (requiring the court only to make "those findings of fact essential to the ultimate conclusion of law"). If the latter, we cannot agree since, as discussed above, the court did take the custody case into consideration in making its ruling. Certainly, we cannot say on this record that the trial court's assessment of the custody matter was beyond the realm of reasonable and that issuance of a CPO was compelled as a matter of law.

For the foregoing reasons, we affirm.

*So ordered.*

BLACKBURNE-RIGSBY, *Chief Judge*, concurring:  I concur in the judgment. However, I write separately because I believe that the majority should have addressed Ms. McKenzie's argument that recent amendments to the Intrafamily Offenses Act, D.C. Code § 16-1005,[9] legislatively overruled or broadened the "good cause" standard for seeking or extending a civil protection order that this court explained in *Ramirez v. Salvaterra*, 232 A.3d 169 (D.C. 2020).  Failure to do so was an important missed opportunity.  We should have addressed this argument—not only because Ms. McKenzie adequately raised the issue here in her intrafamily offense case, but also because addressing the issue would provide important clarity for trial courts in applying the correct legal standard in contested domestic violence cases, when parties still fear for their safety and seek to obtain or extend a civil protection order (CPO).

Ms. McKenzie argues that the *Ramirez* case "may have prompted adoption" of recent amendments to the Intrafamily Offenses Act and that the D.C. Council made a "decision to limit *Ramirez*."  Contrary to Ms. McKenzie's assertions, the D.C. Council did not partially overrule *Ramirez*, nor did it "broaden" the "good cause" standard set forth in *Ramirez*.  Rather, the Amendment Act provided helpful

---

[9] *See* Intrafamily Offense and Anti-Stalking Orders Amendment Act of 2020, D.C. Law 23-275, 68 D.C. Reg. 1086 (Apr. 27, 2021).

clarifications that extensions of CPOs can be granted absent new CPO violations. However, Ms. McKenzie is incorrect in her assertion that *Ramirez ever* required a violation to prove good cause.

In *Ramirez*, 232 A.3d at 185, we synthesized the "Intrafamily Offenses Act, our case law, and the injunctive nature of CPOs" to determine what constitutes "good cause." *Ramirez* was decided roughly a year before the D.C. Council passed the Intrafamily Offenses and Anti-Stalking Orders Amendment Act of 2020, on April 27, 2021. In *Carome v. Carome*, 262 A.3d 242 (D.C. 2021), we extended the *Ramirez* definition of good cause to the initial issuance of a CPO, whereas *Ramirez* dealt with the extension of an existing CPO. Though we decided *Carome* after the passage of the Amendment Act, we applied the law as it existed at the time of the trial court's ruling, which was prior to the amendments. *See Carome*, 262 A.3d at 249 n.2. Ms. McKenzie's arguments mirror those of the dissent in *Carome*, which argued that the amendments had "effect[ed] a significant broadening of the narrow definition of 'good cause' adopted by *Ramirez*." *Id.* at 252 (Glickman, J., dissenting).

Neither *Ramirez* nor *Carome* contended with whether the Amendment Act merely clarified or partially overruled the standard that trial courts must apply when considering either the initial issuance or the extension of a CPO. This court has not

had occasion to squarely address Ms. McKenzie's argument about the amendments' effects on *Ramirez*. Exactly whether or how these recent amendments have changed the factors a trial court must consider when issuing a CPO is still an open and important question, one which, in my view, was put squarely before us in this appeal.

While I agree that the trial court ultimately came to the right conclusion in finding that Ms. McKenzie had not met her burden, several statements in the record show that the state of *Ramirez* after these amendments is not totally clear. The trial judge relied heavily on our analysis in *Ramirez* in making findings and conclusions and also stated, "I think the law . . . has changed since then, but it doesn't change in a way other than that where they say one year, I read in two years in my view[,]" referring to the extended duration of an initial CPO or extension. The trial court concluded that "it's a very similar law, with one exception, which I will note because it does clarify one thing."[10] The trial court also told Ms. McKenzie that she may have an "uphill battle" in obtaining a CPO extension if there were only previous "technical violations and you have no violations of any kind to go over at this point. It's going to be hard to meet the [*Ramirez*] standard." Then the trial court

---

[10] It is unclear which other change the trial court was referring to, as there were several changes to D.C. Code § 16-1005, but presumably the trial court was referring to D.C. Code § 16-1005(d-1)(2) ("Except as provided in paragraph (3) of this subsection, a finding that an order has been violated is not necessary for a finding of good cause to modify or extend an order.").

acknowledged later, "I do not have to find a violation in order to extend [the CPO], but I do need to have . . . good cause to believe that an offense would occur, and it can't be based solely on the prior findings, which is, in my view, essentially what I'm being asked to do here." Deciding whether the trial court's conclusions about the state of the law were correct would provide important clarification for trial judges as they apply the Amendment Act in future CPO hearings.

The Intrafamily Offenses Act was created as a remedy for violence within families. *See Ramirez*, 232 A.3d at 179. Passed by Congress in 1970, the "Act seeks to prevent and remediate particular criminal offenses: intrafamily, interpersonal, and intimate partner violence, as well as stalking, sexual assault, and sexual abuse." *Carome*, 262 A.3d at 247. The Act "provides for the civil treatment of intra-family offenses, and thus gives the court 'a wider range of dispositional powers than criminal courts in order to effect rehabilitation rather than retribution.'" *Cruz-Foster v. Foster*, 597 A.2d 927, 929 (D.C. 1991) (quoting *United States v. Harrison*, 461 F.2d 1209, 1210 (1972)). The Act should be "liberally construed in furtherance of its remedial purposes." *Ramirez*, 232 A.3d at 179.

Prior to the 2021 amendments, the Act allowed a judicial officer to issue a civil protection order for up to one year upon a showing of "good cause," which also could be extended, rescinded, or modified for "good cause shown." *See* D.C. Code

§ 16-1005(d) (2013).  "Good cause" was not defined in the statute.  *See id.*; *see also* *Cruz-Foster*, 597 A.2d at 929.   In *Ramirez*, we "clarified and elaborated upon the legal standard, as articulated in our precedent, for finding 'good cause' with respect to extending a CPO."  *Carome*, 262 A.3d at 248.  We explained that the "good cause" determination requires "the court to find, consistent with [the statute] and the injunctive nature of a CPO, as well as with *Cruz-Foster* and its progeny, that, if the CPO is not extended, there is a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year." *Ramirez*, 232 A.3d at 184.

We further explained in *Ramirez* that in making a good cause determination, "the court must evaluate the entire mosaic of the case, including the parties' relationship and interactions both before and after the issuance of the CPO and any prior extension of the CPO, as well as the parties' current circumstances."  *Ramirez*, 232 A.3d at 173.  Consistent with standards applicable to civil cases, this finding "must be supported by a preponderance of the evidence, and it is the petitioner's burden to put forth this evidence." *Id.* at 180 (citing *Salvattera v. Ramirez*, 111 A.3d 1032, 1037 (D.C. 2015)).

The Amendment Act provides that "[i]f, after a hearing, the judicial officer finds that there is good cause to believe the respondent has committed or threatened

to commit a criminal offense against the petitioner or an animal the petitioner owns, possesses, or controls, or with the consent of both parties, the judicial officer may issue a civil protection order" for an initial period up to two years. D.C. Code § 16-1005(c), (d).

Additionally, the Act provided that a judicial officer may "extend, modify, or vacate an order for good cause shown." D.C. Code § 16-1005(d-1)(1). The Act also now clarifies that a "finding that an order has been violated is not necessary for a finding of good cause to modify or extend an order." D.C. Code § 16-1005(d-1)(2). However, before granting an extension for longer than two years, a judicial officer shall find:

> (A) That the respondent has violated the civil protection order;
>
> (B) That prior to obtaining the order being extended, the petitioner had previously obtained a civil protection order or foreign protection order as that term is defined in subchapter IV of this chapter against the same respondent; or
>
> (C) Other compelling circumstances related to the petitioner's safety or welfare.

D.C. Code § 16-1005(d-1)(3). As in the previous version of the statute, "good cause" for either issuing an initial CPO or rescinding, extending, or modifying one is not defined.

The Committee on the Judiciary and Public Safety's report states that the Act "extends the duration of civil protection orders" to address "serious logistical challenges" faced by petitioners. Intrafamily Offenses and Anti-Stalking Orders Amendment Act, Report on Bill No. 23-0181 before the Committee on the Judiciary & Public Safety at 2 (Nov. 23, 2020) (Committee Report). The Committee Report also explains:

> The bill also clarifies that "[a] finding that an order has been violated is not necessary for a finding of good cause to modify or extend an order." In her testimony before the Committee, [public witness] Muge Kiy testified about the anxiety she experienced due to the "serious possibility of not receiving an extension because there was not violation of [the] protection order." The bill does, however, specify that a judge may extend a civil protection order for longer than 2 years if they found that the respondent violated that order.

*Id.* at 12.

Here, the plain text of the relevant amendments makes clear that violation of a civil protection order is not required to show good cause. *See* D.C. Code § 16-1005(d-1)(2).[11] The amendments clarify that a violation of a CPO is not a

---

[11] We review statutory construction de novo. *Odumn v. United States*, 227 A.3d 1099, 1102 (D.C. 2020). We first look to the plain meaning of the text, but we may look beyond the words of a statute when: (1) "a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve"; (2) "the literal meaning of a statute will not be followed when it produces absurd results";

precondition for an extension that is less than two years long, and that the Council intended to make certain aspects of obtaining a CPO or an extension logistically easier by extending the length of time of such an order.

In *Ramirez*, we said that "the court must evaluate the entire mosaic of the case, including the parties' relationship and interactions both before and after the issuance of the CPO and any prior extension of the CPO, as well as the parties' current circumstances." *Ramirez*, 232 A.3d at 173. As to CPO violations, we explained that a court may examine "violations of the conditions of the CPO that would or did give rise to contempt proceedings, or, conversely, compliance with the conditions of the CPO[.]" *Id.* at 185. A violation of the CPO is included among the "total mix of information in determining whether there is a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year." *Id.*[12] The amendments do not overrule *Ramirez*'s reasoning that, as

---

(3) "whenever possible, the words of a statute are to be construed to avoid obvious injustice"; or (4) "a court may refuse to adhere strictly to the plain wording of a statute in order to effectuate the legislative purpose, as determined by a reading of the legislative history or by an examination of the statute as a whole." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753-54 (D.C. 1983) (en banc) (internal quotations and citations omitted).

[12] However, the plain text is also clear that a trial court must find a violation to support an extension for longer than two years, or must find that the petitioner had previously obtained a CPO or foreign protection order against the same respondent, or find "other compelling circumstances related to the petitioner's safety or welfare." D.C. Code § 16-1005(d-1)(1)-(3).

relevant here, "what has occurred since the original CPO was issued and any subsequent extensions were granted" is "especially relevant, as it constitutes new information that was not previously available to the trial court in issuing or extending the CPO, and, given its recency, may be particularly probative of what is likely to occur in the coming year." *Id*.

Ms. McKenzie argues that the amendments "significant[ly] broaden[ed]" the "good cause" standard as defined in *Ramirez*. In *Ramirez*, 232 A.3d at 187, we explained that "good cause" to extend a CPO is "a cognizable danger of a recurrent violation," and we extended this definition to initial CPOs in *Carome*, 262 A.3d at 248.

The amendments do not "significantly broaden" the definition of "good cause." Importantly, when enacting the amendments, the Council declined to define "good cause," just as it did in the previous version of the statute. Additionally, the Committee Report quotes from *Ramirez* in providing background on the law, including *Ramirez*'s definition that "'good cause' is defined as a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year if the CPO is not extended." Committee Report at 7. The Committee Report does not comment on this definition.

Similarly, the Committee Report quotes from *Ramirez* in explaining that a trial court must consider the "entire mosaic" of the case, including "the parties' relationship and interactions both before and after the issuance of the CPO and any prior extension of the CPO, as well as the parties' current circumstances." Committee Report at 7 n.32 (quoting *Ramirez*, 232 A.3d at 173). The Committee Report does not remark on the "entire mosaic" factors, either in explaining the background of the current law or in explaining the amendments. These absences are important given that *Ramirez* predates these most recent amendments, and so the D.C. Council could have chosen to legislatively overrule either the definition of "good cause" or overrule or further clarify the factors for consideration. *See generally Riggs Nat. Bank of Washington, D.C. v. District of Columbia*, 581 A.2d 1229, 1237 (D.C. 1990) (noting that if the Council had intended a particular construction of an amendment "it would surely not have been difficult . . . for the Council to adopt[] statutory language that clearly effected such an intention, or at least conveyed to the reader that this is what the legislature probably intended" (citing *Superior Beverages, Inc. v. D.C. Alcoholic Beverage Control Bd.*, 567 A.2d 1319, 1323 (D.C. 1989))); *see also Odumn*, 227 A.3d at 1102 ("[W]e are mindful of the canon that no statute should 'be construed as altering the common law, farther than its words import,' a rule creating a rebuttable presumption that the legislature

has not intended 'any innovation upon the common law which it does not fairly express.'" (quoting *Monroe v. Foreman*, 540 A.2d 736, 739 (D.C. 1988))).

I can glean no indication, either from the plain text of the amendments, in the legislative history, or otherwise, that the Council intended to overrule *Ramirez* or "broaden" the good cause definition. The *Ramirez* test, with the amendments' clarifications, reflects the law as it is now, which charges trial courts with examining "the entire mosaic of the case" to determine "good cause" for a CPO or extension.

Therefore, the Amendment Act does several important things. First, it changes the baseline length of an initial CPO or extension from one year to two years in response to serious concerns from petitioners regarding the logistical difficulties stemming from shorter CPOs. The Amendment Act also clarifies that a petitioner does not have to show a violation of a CPO to show "good cause" for modification or extension of an order, provided the extension is no longer than two years. The Amendment Act also does not define (or re-define) "good cause." This clarification is critically important to ensure that individuals involved in domestic violence and intrafamily disputes, who seek a CPO or extension because they fear for their safety, can put forth the full panoply of information relevant to the trial court's determination of whether to grant or extend a CPO.